764 So.2d 74 (2000)
Mary FUSILIER and Lloyd Fusilier, Sr., Ind. and as Legal Guardian of the Minor Lloyd Fusilier, III
v.
Edward (Ned) DAUTERIVE, Jr., M.D., et al.
No. 2000-C-0151.
Supreme Court of Louisiana.
July 14, 2000.
*75 J. Minos Simon, Lafayette, for applicants.
Marc W. Judice, Peter T. Dazzio, Judice & Adley, Lafayette, for respondents.
JOHNSON, Justice.[*]
Plaintiffs, Mary Fusilier, Lloyd Fusilier, Sr., and Lloyd Fusilier, III, brought this medical malpractice action to recover damages for injuries Mary Fusilier sustained while undergoing surgery performed by defendant, Dr. Edward Dauterive, Jr., at Iberia General Hospital. We granted this writ of certiorari to determine whether the jury's determination that the defendant was not negligent in performing the surgery and that his negligence was not a cause of plaintiffs injuries was manifestly erroneous and whether the jury was manifestly erroneous in finding that the defendant did not fail to inform plaintiff of material risks to the surgery. After reviewing all of the evidence and testimony, we hold that the jury was manifestly erroneous in concluding that Dr. Dauterive was not negligent. Accordingly, we reverse the court of appeal's decision to affirm the jury's verdict and remand this matter to the court of appeal to assess damages.

FACTS AND PROCEDURAL HISTORY
In 1989, an ultrasound revealed that Mary Fusilier had a gallstone in her gallbladder. She elected not to have her gallbladder surgically removed at that time. On May 8, 1990, plaintiff visited Dr. Dauterive, a general surgeon, for the first time, complaining of nausea, indigestion, epigastric discomfort, and fatty food intolerance. When another ultrasound confirmed that plaintiff had a gallstone, Dr. Dauterive recommended conservative treatment, i.e., observation and symptomatic treatment, rather than surgery. When plaintiff's symptoms became more severe, she returned to Dr. Dauterive, who discussed treatment alternatives with her. Surgery was recommended, but it had to be delayed because plaintiff was diagnosed with congestive heart failure. Once the congestive heart failure had improved, plaintiff's family physician referred her back to Dr. Dauterive, and on November 9, 1990, she was admitted to Iberia General Hospital to undergo a laparoscopic cholecystectomy.[2]
*76 Dr. Dauterive was assisted in surgery by Dr. Ralph Joseph Fernandez, Jr., a gynecologist who was familiar with the use of the trocar and the varies needle, the instruments used in the procedure. Dr. Fernandez did not participate in the actual performance of the surgery. His role was to observe the technique used by Dr. Dauterive in the use of the laparoscopic instruments.
Initially, the surgery proceeded uneventfully, and the gallbladder was successfully removed. However, after the surgery was completed, the anesthesiologist noticed blood coming from Mrs. Fusilier's mouth. Dr. Dauterive opened her abdomen and discovered that, at some point during the course of the operation, he had perforated her aorta. He also realized that he had pierced her duodenum and mesentery. In his attempt to repair the perforations, he punctured plaintiff's intestine and her splenic capsule.
As a result of the injuries, plaintiff incurred a tremendous blood loss, and her blood pressure dropped on several occasions during the operation. To stabilize plaintiffs condition, the medical staff administered thirty-eight units of blood, nine units of plasma, and eight liters of Plasmalite (a blood "extender"). As a result of the perforation in Mrs. Fusilier's intestine, it was necessary for Dr. Dauterive to perform a colostomy. Eventually, the bleeding was controlled. Her abdomen was then closed, and she was taken to the recovery room in critical condition.
Still hypotensive, Mrs. Fusilier was admitted to the Intensive Care Unit. Her post-operative course was extremely complex. Plaintiffs congestive heart failure recurred, and she developed adult respiratory distress syndrome, which required extended ventilatory support. Blood loss continued over the first weeks of her recovery, requiring intermittent blood transfusions. After several failed attempts to wean plaintiff from the ventilator, the doctors performed a tracheostomy. She also had a feeding tube inserted into her abdomen to facilitate nutritional intake.
Once Mrs. Fusilier's condition improved, she was transferred from the intensive care unit. She was eventually discharged from the hospital on December 24, 1990.
Five days later, Mrs. Fusilier was readmitted to the hospital with sepsis, internal herniation with infarction of the ileum, and significant adhesions in her abdomen. She underwent an abdominal exploration, relief of the abdominal adhesions, a small bowel resection, a right hemicolectomy, and an excision of her colostomy. She remained hospitalized until January 18, 1991. She was then admitted to a skilled nursing facility, where she remained until February 14, 1991.
Plaintiffs later discovered that Dr. Dauterive had never performed a laparoscopic procedure for gallbladder surgery on a human being prior to the one he performed on Mrs. Fusilier. They also discovered that the only training Dr. Dauterive had received concerning the procedure was during a two day course entitled "Surgical Laser in Laparoscopic Cholecystectomy" in Hattiesburg, Mississippi in May, 1990. The course consisted of one day of lectures and one day of participation in handling the instruments to remove the gallbladder of a pig.
Plaintiffs filed a claim with the Medical Review Panel on October 25, 1991. On August 6, 1992, the panel concluded that plaintiff had not proven that Dr. Dauterive, Dr. Fernandez, and Iberia General Hospital deviated from the standard of care which is required of physicians, health *77 care providers, their staff and/or employees of the same speciality. The panel specifically concluded:
1. Dr. Fernandez acted as an assistant, both pre-operatively and post-operatively, was never assigned to treat plaintiff;
2. The equipment at Iberia General Hospital was adequate and appropriate; the credentialing for laparoscopic cholecystectomies was appropriate as to requiring the physician to attend a "handson" course; there is no "standard" accrediting method for all hospitalseach hospital is different, yet most have similar criteria;
3. Dr. Dauterive obtained adequate and appropriate consent; he demonstrated appropriate skill as a general surgeon; the complication experienced by plaintiff is a known complication which, once discovered, was treated and handled appropriately.
On November 6, 1992, plaintiffs filed a petition for damages, naming Dr. Dauterive, Dr. Fernandez, and Iberia General Hospital as defendants. The petition alleged that defendants "deviated from the accepted standards of medical practice for Health Care providers and caused injuries and damages to the named plaintiffs...." Plaintiffs specifically asserted that defendants:
1. Failed to comply with the appropriate standard of care;
2. Failed to have the proper training and experience to take those actions necessary so as to avoid an accident of the type which occurred to plaintiff;
3. Utilized inadequate equipment and personnel;
4. Failed to secure informed consent;
5. Failed to warn of, recognize or properly treat medical risks and emergencies.
Mrs. Fusilier's husband, Lloyd Fusilier, Sr., alleged that he suffered loss of consortium with his wife. Lloyd Fusilier, III, Mrs. Fusilier's grandson, alleged that he suffered loss of consortium, love and support of his grandmother.
Dr. Fernandez and Iberia General Hospital filed motions for summary judgment. The trial court granted both motions, dismissing plaintiffs' claims against those defendants.
The case against Dr. Dauterive was tried by jury. After a six day trial, the jury found that Dr. Dauterive was not negligent and that his negligence was not a cause of Mrs. Fusilier's injuries. The jury also found that Dr. Dauterive did not fail to inform Mrs. Fusilier of the material risks of the surgery. The jury further concluded that Dr. Dauterive was not improperly trained to perform the laparoscopic cholecystectomy on Mrs. Fusilier and that the lack of training was not a cause of injury to Mrs. Fusilier.
Plaintiffs appealed the trial court's judgment pertaining to Dr. Dauterive and Iberia General Hospital, and the court of appeal, with one judge dissenting, affirmed the trial court's decision.[3]Fusilier v. Dauterive, 99-692 (La.App. 3 Cir. 12/22/99), 759 So.2d 821. Judge Peters dissented, being of the view that the damage to Mary Fusilier's aorta, mesentery, and duodenum was the result of negligence. Judge Peters also disagreed with the majority's conclusion that more evidence was needed to establish a case under the theory of res ipsa loquitur.
Plaintiffs filed an application for certiorari with this court. By order dated March 24, 2000, we granted their writ application. Fusilier v. Dauterive, 00-0151 (La.3/24/00), 757 So.2d 646.

*78 DISCUSSION
A trial court's findings of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, through Dep't of Transp. and Dev., 92-1328 (La.4/12/93), 617 So.2d 880. This court has a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. Because we have this duty, we must determine whether the verdict was clearly wrong based on the evidence, or clearly without evidentiary support. Id. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 882-83 (citing Housley v. Cerise, 579 So.2d 973 (La.1991)) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
Plaintiffs contend that the jury erred, as a matter of law, in determining the standard of care. Plaintiffs argue that the jury accepted the testimony of Dr. Edward Chaisson, defendant's expert, who indicated that as long as injuries, which are caused by a physician, are discovered and corrected, the care falls within the reasonable standard of care expected of surgeons. Plaintiffs argue that, by failing to find that defendant was negligent, the trial court has accepted a standard of care which immunizes a physician from liability for his negligence, so long as the physician recognizes his negligent act and corrects it.
The jury's verdict gives little guidance concerning the jury's conclusions on certain factual issues. The jury was asked, "Do you find that Dr. Dauterive, Jr. was negligent which negligence was a cause of Plaintiff's injuries?" That interrogatory was answered in the negative, thereby requiring the jury to deliberate no further. We are unable to determine whether the jury concluded that defendant was not negligent or whether it concluded that defendant was negligent, but the negligence was not a legal cause of the accident. We find no facts in the record persuasive enough to support a conclusion that a physician, who punctured three organs in an attempt to perform a procedure, then punctured two more in an attempt to correct his error, was not negligent.
LSA-R.S. 9:2794 provides, in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq ...., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure *79 to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
* * *
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician.... The jury shall be further instructed that injury alone does not raise a presumption of he physician's... negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence, and judgment. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). A physician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Gordon v. Louisiana State University Board of Sup'rs, 27,966 (La.App. 2 Cir. 3/1/96), 669 So.2d 736; writ denied, 96-1038 (La.5/31/96), 674 So.2d 263. In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Id. (citing White v. McCool, 395 So.2d 774 (La.1981)).
To support the contention that Dr. Dauterive's care of Mrs. Fusilier fell below the standard of care, plaintiff called Dr. William Rout, an expert in the field of general surgery, to testify. Dr. Rout testified that, based on his review of the medical records, Mrs. Fusilier's injuries would not have occurred in the absence of substandard care by Dr. Dauterive. Dr. Rout opined that Dr. Dauterive did not properly perform the laparoscopic cholecystectomy and that defendant's performance deviated from the standard of care. He stated that plaintiff's injuries occurred when the varies needle or the trocar was inserted, and he implied that defendant inserted the instruments too hard, pushing the organs into the needles, thereby penetrating the aorta and the intestines.
Dr. Rout also testified that during the insertion of the varies needle, Dr. Dauterive should have angled the needle downwards to avoid piercing the aorta. He stated that failure to insert the needle at an angle will result in the aorta being punctured. Dr. Rout concluded that if the procedure had been done correctly, the chances of having the complications that plaintiff suffered are minimal.
Additionally, Dr. Rout testified that defendant was not properly trained to perform laparoscopic surgery on November 9, 1990. He stated that attending a two day course and practicing the technique on pigs was insufficient to prepare defendant to operate on a human being. Furthermore, he stated that Dr. Dauterive attended the course six months prior to attempting the procedure and did nothing in the interim to improve his skills. He stated that defendant should have assisted in other laparoscopic procedures before actually performing one. He concluded that if plaintiff's surgery had been conducted by a surgeon properly trained in laparoscopic procedures, the injury to plaintiffs aorta probably would not have occurred.
Dr. Rout also testified that Dr. Dauterive breached the standard of care by performing the procedure on a patient who was not an appropriate candidate. Dr. Rout stated that people like Mary Fusilier, who are obese and have had prior abdominal surgeries, are less than ideal candidates for laparoscopic cholecystectomies.
Dr. Rout's testimony was directly controverted by other witnesses. Dr. Fernandez, who assisted defendant during the procedure, testified that Dr. Dauterive did *80 not use an inappropriate approach in angling the varies needle or trocar. He stated that he did not see any problems with the placement of the subsequent trocars, nor was there any problem with the insertion of the camera. Dr. Fernandez stated that he did not observe Dr. Dauterive having a problem with the use of the laparoscopic instruments. He further testified that, if he had observed a problem with defendant's technique, he would have corrected him.
Dr. Fernandez also contradicted Dr. Rout's statement that prior abdominal surgeries are contraindicated in laparoscopic cholecystectomies. While Dr. Fernandez admitted that the procedure may not be appropriate for patients who have major scarring from previous surgeries, there is nothing in her medical records to indicate that Mary Fusilier had major scarring from the prior surgeries.
Dr. Fernandez further repudiated Dr. Rout's testimony regarding the angle of the varies needle during the initial penetration. Dr. Fernandez stated that regardless of the technique, injuries occur during laparoscopic surgeries. He also stated that there is no foolproof technique for entry.
Dr. Edward Chaisson also testified as a defense expert in the field of general surgery. Dr. Chaisson saw no problem with the training Dr. Dauterive received prior to performing the laparoscopic cholecystectomy on plaintiff. He stated that prior to performing his first such procedure, he attended a course in which the learned how to insert or gain entry with the varies needle and the trocars. He testified that he did not receive any hands-on training involving animals or humans. He admitted that he observed three laparoscopic cholecystectomies prior to attempting his first one.
Dr. Chaisson, who also served as a member of the medical review panel which reviewed this case, opined that Dr. Dauterive met the standard of care for general surgeons. He testified that perforations are complications of laparoscopic procedures. According to Dr. Chaisson's understanding of the standard of care, whenever a patient has a complication, and the complication is recognized and treated appropriately, the standard has been met. In this case, Dr. Dauterive recognized that plaintiff was bleeding, located the source of the bleeding, and treated it appropriately.
Dr. Barry McKernan, the physician who performed the first laparoscopic cholecystectomy in the United States, also testified as an expert in the field of general surgery. Dr. McKernan testified that Dr. Dauterive met the standard of care in his care of Mrs. Fusilier. He stated that the training that defendant received prior to performing the surgery was probably more extensive than most doctors received at that time. He contradicted Dr. Rout's testimony by expressing that obesity and prior abdominal surgeries are not contraindications in performing laparoscopic cholecystectomies. He further noted that prior surgeries are only an issue when those surgeries are in the same area that the current surgery is being performed. The locations of plaintiffs prior surgeries, a hysterectomy and an appendectomy, were not in the vicinity of the site of the cholecystectomy. Dr. McKernan also testified that injuries associated with trocars and varies needles may occur despite experience and the use of safeguards.
During the cross-examination of Dr. McKernan, plaintiff questioned the doctor regarding an article he co-authored in 1990 in which he stated, "surgeons should complete approximately one year of basic course work in diagnostic laparoscopy before preceptoring and performing laparoscopic operative procedures." The article also stated that, prior to performing his first laparoscopic cholecystectomy, a surgeon should perform "twenty-five to fifty diagnostic laparoscopies under direct supervision in a preceptored setting." However, Dr. McKernan explained the contradiction by stating that the publication of *81 the article was delayed, and by time the article was published, the contents were "totally outdated."
It was established by testimony at trial that, in 1990, there were no national standards for physicians to follow regarding performing laparoscopic cholecystectomies. However, we reject Dr. Chaisson's contention that the standard of care is met as long as the physician recognizes a complication and handles it appropriately. In this case, it is undisputed that Dr. Dauterive caused plaintiffs complications, i.e., the perforated aorta, mesentery, and duodenum. It is also undisputed that, in his attempt to repair the perforations, he punctured plaintiffs intestine and her splenic capsule. We repudiate the contention that the standard of care is met when a physician, who negligently causes injuries, takes measures to correct them.
Although we are always reluctant to overrule a jury's verdict, the jury's decision in this case was manifestly erroneous. None of the experts testifying at the trial offered any plausible explanation for the injuries plaintiff suffered. The perforations of plaintiff's aorta, duodenum, and mesentery were all dismissed as unfortunate "complications" of the procedure. The only explanation offered by defendant for perforating plaintiff's aorta, duodenum, and mesentery, is an unsupported allegation that plaintiff's aorta must have been displaced. However, the operative report does not reflect that observation, and none of plaintiffs medical records support defendant's contention that plaintiff had any anatomic abnormality or variation. The only logical conclusion is that Dr. Fusilier negligently inserted the needles, either by location or angle, and perforated Mrs. Fusilier's aorta, duodenum, and mesentery.

CONCLUSION
For the foregoing reasons, we hold that the jury was manifestly erroneous in concluding that Dr. Dauterive was not negligent. Accordingly, we reverse the court of appeal's decision to affirm the jury's verdict and remand this matter to the court of appeal to assess damages.
REVERSED AND REMANDED.
LEMMON, J., concurs.
NOTES
[*] Marcus, J., not on panel. See Rule IV, Part 2, § 3.
[2] The instrumentality of a laparoscopic cholecystectomy differs from that of the traditional "open" cholecystectomy.' In an open cholecystectomy, the abdomen is opened, and the gallbladder is removed through a large incision. In a laparoscopic cholecystectomy, a small incision is made immediately above the umbilicus, and a varies needle is inserted into the incision. The peritoneal cavity is then inflated with carbon dioxide via the varies needle. Thereafter, the varies needle is removed, and a laparoscopic trocar is inserted into the abdominal cavity through the umbilical incision. A laparoscope is then inserted through the trocar. The peritoneal cavity is illuminated by a high-intensity xenon light source, while the internal organs of the abdominal cavity are visualized via a miniature camera attached to the end of the laparoscope. The video output from the camera is channeled to a monitor which is positioned such that the surgeon and his assistant(s) can continuously monitor the progress of the operation. Three additional small incisions are created through the abdominal wall to assist in the dissection and removal of the gallbladder. Trocars are placed through those incisions, and forceps are inserted and used to retract the gallbladder. Once the gallbladder, the cystic duct, and the artery are identified, the gallbladder is dissected from its attachment to the liver and is removed via the umbilical incision.
[3] The court of appeal also affirmed the trial court's decision to grant Iberia General Hospital's motion for summary judgment. Plaintiffs did not raise that issue in brief or in oral argument. Therefore, the court of appeal's decision regarding Iberia General Hospital is final. Additionally, the trial court's judgment dismissing plaintiffs' claims against Dr. Fernandez is final, as plaintiffs did not appeal that judgment.