hBROWN, C.J.
This medical malpractice action was instituted by plaintiff, Robert Jones, Jr., a 23-year-old airman stationed at Barksdale Air Force Base, against defendants, Dr. Victor Hernandez and Louisiana Mutual Insurance Company (“LAMMICO”). On *247 the night of October 30, 1999, plaintiff went to the emergency room at Christus Schumpert Medical Center in Shreveport, Louisiana. Dr. Hernandez was the general surgeon on call. After explaining the situation to plaintiff and to plaintiffs father in Kentucky by telephone, Dr. Hernandez removed plaintiffs gallbladder by performing an emergency laparoscopic cholecystectomy[1] early the next morning.
About a month after being discharged from the hospital, Jones went to the clinic at Barksdale reporting nausea, vomiting, orange urine, pale gray stools, and yellow eyes. Thereafter, on November 30, 1999, he was readmitted to Christus Schumpert. On December 1, 1999, tests[2] revealed a near obstruction of the common hepatic duct[3] near the site of surgical clips used by Dr. Hernandez in the cholecystectomy.
On December 3, 1999, Jones underwent an exploratory laparotomy performed by Drs. Gazi Zibari and Earl Walker. The cause of obstruction [¿was determined to be a surgical clip blocking the common hepatic duct. This obstruction was corrected with a Roux-en-y [4] procedure.
Jones filed a request for a medical review panel on October 10, 2000, asserting negligence on the part of Dr. Hernandez. On January 15, 2002, the panel rendered an opinion in favor of Dr. Hernandez, finding no malpractice on his part in performance of the emergency laparoscopic chole-cystectomy on claimant. Thereafter, on April 16, 2002, Jones filed a petition seeking damages from Dr. Hernandez and LAMMICO. The matter was tried in June 2003. The issues presented at trial were whether the common duct was clipped, and if so, whether this was a recognized risk of the procedure; and whether defendant breached the standard of care by not converting from a laparoscopic to an open procedure.
The trial court issued written reasons on September 23, 2003, and rendered judgment in favor of defendants on October 9, 2003. It is from this judgment that Jones has appealed, claiming manifest error. We affirm.

Discussion

Plaintiff asserts that the trial court erred in failing to find that Dr. Hernandez deviated from the applicable standard of care by: (1) placing a clip on the common hepatic duct; (2) failing to convert from a laparoscopic cholecystectomy to an open procedure; and (3) failing to recognize and correct the improperly placed clip.
La. R.S. 9:2794 requires that in a medical malpractice action against a specialist, the plaintiff must prove by a preponderance of the evidence: (1) |3that the physician’s treatment fell below the standard of care applicable to a doctor in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Powell v. Fuentes, 34,666 (La.App.2d Cir.05/09/01), 786 So.2d *248 277, writ denied, 01-1675 (La.09/21/01), 797 So.2d 674; Marks v. Jones, 29,881 (La.App.2d Cir.12/10/97), 705 So.2d 262; Roberts v. Cox, 28,094 (La.App.2d Cir.02/28/96), 669 So.2d 638.
An unsuccessful course of treatment is not per se an indication of malpractice. Wainwright v. Leary, 623 So.2d 233 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1127 (La.1993). A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession, and to use reasonable care, diligence, and judgment. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986); Hughes v. Bailey, 29,314 (La.App.2d Cir.04/02/97), 691 So.2d 359. A physician is not required to exercise the highest degree of care possible. Instead, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. The law does not require absolute precision from a physician. A physician’s conduct and professional judgment are to be evaluated in terms of reasonableness under the existing circumstances and are not to be viewed in hindsight, in terms of results, or in light of subsequent events. Campbell v. Hospital Service District No. 1 Caldwell Parish, 37,876 (La.App.2d Cir.12/10/03), 862 So.2d 338, writ denied, 04-0069 (La.03/19/04), 869 So.2d 852; |4Marks, supra; Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992).
The assistance of expert testimony is needed to establish the applicable standard of care, whether the standard of care was breached by the defendant doctor’s conduct, and whether that breach resulted in injury to the plaintiff. Edwards v. Raines, 35,284 (La.App.2d Cir.10/31/01), 799 So.2d 1184; Pugh v. Beach, 31,361 (La.App.2d Cir.12/11/98), 722 So.2d 442. The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. Green v. K-Mart Corporation, 03-2495 (La.05/25/04), 874 So.2d 838; Bolton v. Louisiana State University Medical Center, 601 So.2d 677 (La.App. 2d Cir.1992); Sawyer v. Niagara Machine and Tool Works, 535 So.2d 1057 (La.App. 2d Cir. 1988), writ denied, 536 So.2d 1222 (La.1989). The importance placed upon such testimony is largely dependent upon each expert’s qualifications and the facts that form the basis of each opinion. Solito v. Horseshoe Entertainment, 36,667 (La.App.2d Cir.12/18/02), 834 So.2d 610; Bolton, supra; Winford Co., Inc. v. Webster Gravel and Asphalt, 571 So.2d 802 (La.App. 2d Cir.1990). Where there are contradictory expert opinions concerning compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Lyons v. J.A. Auger, Inc., 35,691 (La.App.2d Cir.06/12/02), 821 So.2d 536, writ denied, 02-2337 (La.11/15/02), 829 So.2d 437; Marks, supra; Wainwright, supra.
[(¡The threshold element that a medical malpractice claimant must establish in an action against a specialist such as Dr. Hernandez is that the conduct of the defendant physician fell below the applicable standard of care. Edwards, supra; Hinson v. Glen Oak Retirement Home, 34,281 (La.App.2d Cir.12/15/00), 774 So.2d 1134.
To establish the standard of care applicable to general surgeons who perform gallbladder surgeries, plaintiff presented the expert testimony of Earl Walker, M.D., and introduced into evidence the deposition testimony of David Rayburn, M.D., a general surgeon practicing in the *249 Alexandria/Pineville area and a member of the medical review panel in this case.
Earl Walker, M.D., is a retired general surgeon who, after years of private practice, enlisted in the Air Force. During that time, he served as chief of the medical staff at Barksdale Air Force Base. Dr. Walker noted that for the first two years he was stationed at Barksdale, there were on-base facilities for surgeries, including gallbladder removals, but because of cutbacks, beginning in 1997 the base was restricted to providing only clinic services. By the time that Jones required emergency gallbladder surgery, October 1999, all surgical procedures were done off base.
Dr. Walker first saw Jones on November 30, 1999. At that time, Jones was complaining of nausea, vomiting, orange/yellow urine, and gray stools. From his physical exam, Dr. Walker found that Jones was jaundiced, and the doctor referred Jones to Christus Schumpert. Given Jones’ history of prior gallbladder surgery, Dr. Walker consulted with Dr. Dale McGinty, |fiwho performed an endoscopic retrograde cholangiography, which revealed an obstruction in the proximal portion of Jones’ common hepatic duct. Specifically, there was a surgical clip across the common duct. Dr. Walker conceded that the obstruction was not total, but was a partial occlusion. Had the clip caused a total obstruction, Jones would have been symptomatic immediately, rather than four weeks post-op.
Dr. McGinty recommended surgical intervention at that time. Dr. Walker, who had not done a Roux-en-Y procedure in over ten years, requested the services of Dr. Gazi Zibari, a liver transplant specialist at LSU Health Sciences Center. Dr. Walker testified that he assisted Dr. Zibari during the procedure and observed a clip across the common hepatic duct, approximately lk centimeters from the bifurcation of the left and right hepatic ducts.[5] The clip had caused formation of dense fibrotic tissue around the area. Dr. Walker noted that the Roux-en-Y procedure was successful.
In his 40 years experience as a general surgeon, Dr. Walker stated that he has performed both open and laparoscopic cholecystectomies. The laparoscopic procedure was developed to shorten the patient’s hospital stay and to cause less trauma to the abdominal wall. Dr. Walker acknowledged that there is no difference in the standard of care for emergent versus elective gallbladder surgery. Dr: Walker opined that converting from a la-paroscopic procedure to an invasive open one is indicated if there is |7excessive inflammation and/or edema of the gallbladder or if excessive bleeding is encountered.
Having reviewed all of the pertinent medical records, Dr. Walker testified that, given the fact that Jones had overwhelming inflammatory changes in his gallbladder, together with distension, redness and edema, the standard of care required Dr. Hernandez to convert from a laparoscopic to an open procedure.
According to Dr. Walker, in a typical laparoscopic cholecystectomy in which there' are no complications, an expected blood loss would be around 15-22 ccs. In Jones’ case, Dr. Hernandez noted a blood loss of 100 ccs. The standard of care, when there is such a large amount of blood lost, requires conversion from a laparo-scopic procedure to an open one.
*250 Furthermore, it is within the standard of care for surgeons who perform cholecys-tectomies to confirm proper placement of the surgical clips used prior to terminating the procedure. Clip placement compromises blood flow to the area clipped. It is a common occurrence for scar tissue to form around or at the site of a surgical clip. The body responds to a foreign body such as a clip, which it isolates by forming fibrous tissue around the object. Specifically, bile fluids in the common hepatic duct also have an effect on the development of scar tissue.
Dr. David Rayburn, a board certified general surgeon in private practice in the Alexandria/Pineville area, testified via deposition. Dr. Rayburn served on the medical review panel in the instant case. He noted that he has performed numerous abdominal surgeries, including open and | ^laparoscopic gallbladder removals. Dr. Rayburn reaffirmed the panel’s conclusion that Dr. Hernandez met the applicable standard of care for a general surgeon in his care and treatment of Jones.
The pertinent records show that there was no question but that Jones, who had acute cholecystitis, presented an urgent surgical need, and it was in his best interest that his gallbladder be removed as soon as possible. The pathology confirmed that Jones had an inflamed gallbladder and gallstones. Dr. Hernandez’s operative notes support that his decision to proceed laparoscopically was prudent and appropriate.
One day post-operative, Jones’ lab values, particularly the liver function studies, were normal. At that time, there was no indication that his common hepatic duct had been compromised. When Dr. Hernandez saw Jones ten days later, he noted that Jones was doing well, had no infection, and no complaints of any significance.
On cross examination, Dr. Rayburn’s testimony became equivocal. He confirmed that the standard of care requires the surgeon to clearly define the ductal anatomy prior to division and transection. According to Dr. Rayburn, the standard of care regarding conversion from laparosco-py to an open procedure requires conversion only when the surgeon cannot clearly define the ductal anatomy during the course of a laparoscopic procedure.
Dr. Rayburn testified that it is below the applicable standard of care to place clips on the common hepatic duct during a gallbladder removal. Likewise, it is a deviation from the standard of care to fail to recognize that a clip has been placed on the common duct and to correct it prior to closure.
19According to Dr. Rayburn, had Dr. Hernandez placed a clip on the common duct, creating a partial obstruction, and failed to recognize and correct the situation prior to closing, this would have been a deviation from the standard of care. From his review of the pertinent records, however, Dr. Rayburn was adamant that there was no evidence to support the conclusion that a clip had been placed on the common duct. Dr. Rayburn noted that had he been presented with any evidence to show that Dr. Hernandez did in fact place a surgical clip on the common hepatic duct during Jones’ procedure, his opinion that the surgeon met the applicable standard of care would change.
Jones’ post-operative lab values support the conclusion that Dr. Hernandez did not clip the common duct, inadvertently or otherwise. Had a clip been placed such that it was partially obstructing the common duct, Jones’ bilirubin count would have been elevated and this fact would have shown up in the lab workup. Jones had no such change in his lab values. What that indicates to Dr. Rayburn is that *251 Jones did not have a common duct obstruction at that time, or, if he did, it was minimal, occluding at most 10-20% of the common duct.
Dr. Rayburn noted that, with the passage of time and the development of scar tissue, a stricture would have formed, increasing the narrowing and causing an elevation in the bilirubin levels. This was the situation when Jones presented to the hospital on November 30,1999.
As part of his case in chief, plaintiff called Dr. Hernandez on cross examination. When Jones presented to the emergency room on October 31, Iml999, Dr. Hernandez examined him, reviewed x-rays, lab tests, and an abdominal ultrasound, and concluded that Jones had cholecystitis (inflammation of the gallbladder) as well as cholelithiasis (presence of a stone in the gallbladder). Dr. Hernandez felt that emergent laparoscopic gallbladder surgery was indicated.
Dr. Hernandez stated that the standard of care ordinarily practiced by surgeons who perform laparoscopic cholecystecto-mies requires the physician to clearly define the ductal anatomy prior to cutting anything. In a laparoscopic cholecystecto-my, he typically uses four surgical clips on the cystic duct, two close to the gallbladder and two close to the common hepatic duct, and four clips on the cystic artery. In the absence of any biliary connections that require clipping, it is normal for four clips to be left in the patient.
Dr. Hernandez’s operative notes do not indicate that he encountered any vessels or biliary connections which would have required extra clips, but he testified that he could very well have used extra clips and just failed to indicate this in his report.
Dr. Hernandez stated that in a typical gallbladder removal, blood loss is 50-75 ccs, but noted that it is not unusual for blood loss to exceed that, particularly in cases of severe, acute cholecystitis, as was the situation he encountered in Jones’ presentation. In cases in which the patient has excessive bleeding which would prevent dissection, conversion to an open procedure is an option. However, 90% of the time, proceeding laparoscopically is warranted. Dr. Hernandez noted that Jones had a In distended gallbladder with fluid accumulation. He also found a good deal of inflammatory changes in the gallbladder.
Notwithstanding these findings, Dr. Hernandez felt that inasmuch as he was able to dissect and identify the anatomical structures, laparoscopic surgery was appropriate. He conceded that the presence of inflammation and distension makes the procedure more difficult, but testified that he had no trouble identifying the anatomy, so he proceeded laparoscopically. Although he did encounter excessive bleeding in Jones’ case, Dr. Hernandez testified that he controlled the hemostasis (bleeding) through electrocautery.
Dr. Hernandez testified that clipping the common hepatic duct is not in the surgical technique of gallbladder removal. Specifically, placing a clip on the common duct during gallbladder surgery is not within the applicable standard of care. Dr. Hernandez was adamant that he did not place a clip on Jones’ common hepatic duct during the laparoscopic cholecystectomy. Dr. Hernandez reiterated that he placed a clip one-half to one centimeter below the bifurcation of Jones’ right and left hepatic ducts. He also disputes that Dr. Zibari found a clip on Jones’ common duct. According to Dr. Hernandez, scar tissue and inflammation caused the surgical clips he left in Jones to relocate and, along with the cystic duct, crowd the common hepatic duct. This is why a clip was found in scar tissue in the area of Jones’ common duct.
*252 Dr. Hernandez noted that it is a surgeon’s responsibility to look around and make certain everything is in place prior to closing the patient. | ^Particularly, it is within the applicable standard of care for a surgeon to confirm proper clip placement. Although he continued to deny that he placed a clip on Jones’ common hepatic duct, Dr. Hernandez stated that, hypothetically speaking, had he done so and then failed to check the clips for proper placement, he was wrong.
On direct examination, Dr. Hernandez testified that when Jones presented to the emergency room on October 31, 1999, his gallbladder, which was reddened, edema-tous,[6] and inflamed, required emergency surgical intervention. During the laparo-scopic procedure, there was no indication that conversion to an open surgery was necessary.
Dr. Hernandez stated that when bleeding is encountered during a laparoscopic cholecystectomy, it does not automatically require conversion to an open procedure. When the bleeding can be controlled, and the structure to be dissected can be accurately identified, there is no reason to convert mid-procedure.
What happened in Jones’ case was not medical malpractice, but a known complication or risk of gallbladder removal surgery. Dr. Hernandez noted that the rate of complications involving injury to the common hepatic duct during gallbladder surgery is .5-1.5%. Again, Dr. Hernandez denied placing a surgical clip across Jones’ common hepatic duct; a CAT scan, which wasn’t done in this case, would have provided a view of the entire common duct. Nonetheless, inadvertent placement of a surgical slip on the common hepatic duct is a complication of gallbladder surgery.
11sDr. Brian Dockendorf, a board certified general surgeon, served on the medical review panel in this matter. Dr. Dock-endorf related that the panel’s decision was unanimous that Dr. Hernandez met the standard of care applicable to a general surgeon in his treatment and care of Jones. This was still his opinion at trial.
According to Dr. Dockendorf, conversion to an open procedure is necessary when the surgeon is unable to clearly see the gallbladder and surrounding structures, or when faced with bleeding that cannot be controlled with the small instruments utilized during the laparoscopic procedure. Dr. Dockendorf pointed out that changing to an open procedure does not prevent injury or complications, which are the same as those which can occur during la-paroscopic surgery. Injury to the common duct is one of the main complications to occur during gallbladder surgery. In fact, it is listed at the top of the consent form as a potential complication. Based upon his review of the information presented to the review panel and at trial, it was Dr. Dock-endorf s opinion that there was nothing in Jones’ case which indicated that removal of his gallbladder could not be accomplished laparoscopically.
Jones’ lab values were within normal limits following the operation, and he presented with no complaints on his visit with Dr. Hernandez eleven days post-surgery. Jones did not begin having problems until 25-26 days post-operative, which is inconsistent with the contention that there was a surgical clip completely occluding the common hepatic duct. According to Dr. Dockendorf, a clip across the common duct would have caused a |ucomplete obstruction, which would have manifested itself with symptoms almost immediately. Dr. Dockendorf pointed out that the x-ray films taken prior to the Roux-en-Y correc *253 tive procedure do not show a complete occlusion, but a tapered narrowing with scarring. Nonetheless, whether the surgical clip was partially or wholly occluding Jones’ common duct, Dr. Doekendorf opined that Dr. Hernandez met the applicable standard of care.
On cross examination, Dr. Doekendorf testified that the information presented to the panel and at trial did not establish exactly what it was that caused the obstruction of Jones’ common hepatic duct. He reiterated that, even if there was a clip on Jones’ common duct, Dr. Hernandez did not deviate from the standard of care. Although it is not within the standard of care to intentionally place clips on the common duct during gallbladder surgery, unintentional placement is a complication and is within the standard of care. This occurs when the cystic duct and common duct are misidentified and clipped.
In a routine gallbladder extraction, blood loss is typically less than 50 ccs. In a procedure involving an acute, inflamed gallbladder, as was Jones’, blood loss can be as high as 400 ccs. Dr. Doekendorf observed that Jones’ estimated blood loss was 100 ccs and noted that this type of bleeding is addressed during surgery by suction, irrigation, and cauterization.
On redirect examination, Dr. Docken-dorf emphasized that the decision of whether to convert to an open procedure from a laparoscopic extraction is within the surgeon’s discretion. According to Dr. Doekendorf, it is extremely difficult to second-guess the exercise of this discretion postjoperatively.16 Dr. Doekendorf finally noted that, notwithstanding all of the advances in gallbladder surgery, injuries to the common hepatic duct do occur in a certain percentage of cases, even when there is not a deviation from the standard of care.
Dr. Charles Knight, who is board certified in general and vascular surgery, was the third member of the review panel. He concurs with Drs. Rayburn and Docken-dorf that the evidence supports Dr. Hernandez’s decision to proceed laparoscopi-cally with Jones’ gallbladder removal. Nothing he has heard or seen since rendition of the panel’s opinion has changed his mind.
Because the clinical picture in the diagnostic study done when Jones returned to the hospital three and one-half weeks after his gallbladder was removed was not clear, there is confusion as to what was actually causing the obstruction to his common duct. However, even if there was a clip on Jones’ common hepatic duct, Dr. Knight opined that Dr. Hernandez did not breach the applicable standard of care.
Dr. Gazi Zibari, professor of surgery at LSU Health Sciences Center, and a board certified general surgeon, performed the Roux-en-Y repair surgery on Jones following the development of complications after his gallbladder surgery. Dr. Zibari noted that the standard of care for an emergency gallbladder removal is to begin the procedure laparoscopically. In 98-99% of the time, the organ can be successfully removed by this method. Conversion to an open procedure is not necessary unless uncontrollable bleeding is encountered or clear delineation of the _Jj£anatomical structures is not possible, which would be the case if there were too many adhesions or excessive inflammation. Although distension and/or edema used to indicate a need for conversion to an open procedure, that is no longer the case.
In a routine laparoscopic surgery, blood loss should not exceed 100 ccs. A surgeon encountering excessive bleeding during a procedure can achieve hemostasis by using more surgical clips or electrocautery to coagulate the tissue.
*254 Dr. Zibari concurred with the other experts that it is not within the standard of care to clip the common hepatic duct during a laparoscopic cholecystectomy. Proper identification of ductal structure is within the standard of care. While the common duct should not be clipped, this does happen even in the “best hands.” In fact, this is a well-known complication associated with the procedure.
Dr. Zibari’s pre-operative diagnosis of Jones was post-laparoscopic cholecystecto-my with an iatrogenic (occurring during surgery) injury. When Dr. Zibari performed the corrective procedure on Jones, he found a clip across the patient’s common hepatic duct approximately one-half centimeter from the bifurcation of the left and right ducts. This clip was the cause of the obstruction of the common duct. Dr. Zibari noted that in a case involving an inflamed gallbladder, it is not difficult for the common duct to be confused with the cystic duct. Apparently that was the situation in this case.
117The trial judge’s inferences from the facts of this case, and his conclusion as to the credibility of the extensive expert testimony, were reasonable determinations made on this record. The evidence, particularly the expert testimony, justifies the trial court’s factual determination that plaintiff failed to carry his burden of proof under La. R.S. 9:2794 that Dr. Hernandez breached the applicable standard of care in his treatment of plaintiff.
In his second assignment of error, plaintiff contends that the trial court erred in failing to require Dr. Hernandez to provide a plausible, non-negligent explanation for the injury sustained by plaintiff, and cites Fusilier v. Dauterive, 00-0151 (La.07/14/00), 764 So.2d 74. Although both the instant case and Fusilier involve claims arising out of injuries allegedly sustained as a result of surgical error in the performance of a laparoscopic gallbladder removal, we note that the facts of the case sub judice are inapposite to those presented in Fusilier, supra.
In Fusilier, the claimant underwent la-paroscopic cholecystectomy surgery in 1990. The expert testimony was unequivocal that, at that time, there were no national standards for physicians to follow regarding the performance of a laparo-scopic cholecystectomy. The supreme court rejected the testimony of one of the medical experts and repudiated the contention that the standard of care is met as long as the physician recognizes a complication and handles it appropriately.
Dr. Hernandez performed laparo-scopic surgery on Jones more than nine years after the surgery in Fusilier. During that period of time, as all six | ^medical experts testified in the instant case, national standards for surgeons to follow in performing laparoscopic cholecystectomies were developed. Five of the six physicians testified that the applicable standard of care for a surgeon performing a laparo-scopic cholecystectomy include the following:
(1) the intentional placement of a surgical clip on the common hepatic duct is not within the applicable standard of care; however, injury to the common duct, whether by an inadvertently placed clip or subsequent scar tissue formation, is a known and accepted risk of the procedure; (2) it is within the discretion of a surgeon to determine whether to convert from a laparoscopic cholecystectomy to an open procedure; and (3) when there is injury to the common hepatic duct, it is usually detected post-operatively rather than during the procedure.
As found by the Third Circuit in Primeaux v. St. Paul Fire & Marine Insurance Co., 03-0466 (La.App. 3d *255 Cir.12/17/03), 862 So.2d 496, in the case sub judice, we find that there was sufficient evidence presented which showed that Jones’ injuries could have occurred without any negligence on the part of Dr. Hernandez, and restate our finding that Dr. Hernandez’s actions during the laparo-scopic cholecystectomy were within the ap^ plicable standard of care for general surgeons who perform this procedure.

Conclusion

For the reasons set forth above, the judgment of the trial court is AFFIRMED. Costs are assessed to plaintiff-appellant, Robert Jones.

. This surgery involves excision or removal of the gallbladder through an abdominal incision by use of a laparoscope, which is an endoscope used to examine the interior of the abdomen.

. An endoscopic retrograde cholangiography involves the visual examination of the interior parts of hollow structures in the body and radiographic examination of the bile ducts.

. This is the predominantly extrahepatic bile duct which is formed by the junction of the right and left hepatic ducts (which are primarily intrahepatic), which in turn joins the cystic duct to form the common bile duct.

. A y-shaped surgical union or shunt is made or placed between any part of the digestive system, in this case the common hepatic duct, and the small intestine.

. This juncture is known as the porta hepatis, which also includes the porta vein and hepatic artery.

. Swollen to reflect an abnormal accumulation of fluid.